IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| DAMIAN RODERICK WHITE,<br><br><br><br>Debtor. | Chapter 7<br>Case No. 05-21488-SSC<br><br>**MEMORANDUM DECISION**<br>(Opinion to Post) |

### I. PRELIMINARY STATEMENT

This matter comes before the Court as a result of a "Motion to Compel Turnover of Homestead Sale Proceeds" filed by Lawrence J. Warfield, the Chapter 7 Trustee, against Damian Roderick White, the Debtor. Initially the Debtor acted pro se, his prior counsel having withdrawn.[1] However, during the course of the pre-trial proceedings, the Debtor retained new counsel who represented him at the evidentiary hearing in this matter. Because of certain unique issues presented herein, the parties submitted pre- and post-trial memoranda of law and were able to stipulate to certain facts presented to this Court.[2] The Court held an evidentiary hearing

---

**1.** *See* Docket Entry Nos. 31 and 34; Motion to Withdraw and Order granting Motion to Withdraw as Attorney.

**2.** The Stipulated Facts were filed with the Court on June 22, 2007 (Docket Entry No. 45) and were also admitted as an exhibit at trial. *See* Exhibit 23. The Trustee's Memorandum of Law was filed on June 25, 2007. *See* Docket Entry No. 48. The Debtor's Memorandum of Law was also filed on June 25, 2007 and designated Docket Entry No. 47. The parties were also able to stipulate to the admissibility of all of the Exhibits for trial, they filed post-trial memoranda of

1

on June 27, 2007. At the conclusion of the hearing, the Court directed the parties to file further memoranda of law by July 23, 2007, and the matter was deemed under advisement upon receipt of those additional briefs.

In this Memorandum Decision, the Court has set forth its findings of fact and conclusions of law pursuant to Fed.R.Bank.P. 7052. The issues addressed herein constitute a core proceeding over which this Court has jurisdiction. 28 U.S.C. §§ 1334(b) and 157(b) (West 2007).[3]

## II. STIPULATED FINDINGS OF FACT

The Debtor sold his residence located at 6152 W. Donald Drive, Glendale, Arizona on August 31, 2005, for the sum of $475,000, from which he received net proceeds in the amount of $165,095.98.[4] The Debtor deposited the sum of $162,729.36, from the net sale proceeds, in a checking account on the same day. On September 1, 2005, the very next day, the Debtor transferred the sum of $125,000 of the net sale proceeds to a brokerage account.[5] On September 6, 2005, the Debtor transferred the sum of $25,000 of the net sale proceeds from his checking account to a savings account.

The Debtor filed his Chapter 7 petition on October 7, 2005. On the filing date, the Debtor had $34.30 in his checking account. In his savings account, the Debtor held the sum of $22,034, which the parties agree were identifiable cash proceeds from the sale of his

law (Trustee's Memorandum is Docket Entry No. 51; Debtor's Memorandum, Docket Entry No. 50).

**3.** All references in this decision are to the Bankruptcy Code, 11 U.S.C. §§ 101-1330, and to the Federal Rules of Bankruptcy Procedure as enacted and promulgated prior to the effective date of most of the provisions of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub.L. 109-8, April 20, 2005, 119 Stat. 23.

**4.** Also see Exhibit 1.

**5.** Specifically, the Debtor placed the funds in a Charles Schwab Signature Trading/Brokerage Account by Check No. 1224. Also see Exhibit 2 at 2.

2

residence. The parties agree that the Debtor held the sum of $116,078.26, in identifiable cash proceeds, in the Debtor's brokerage account, and the Debtor had invested the additional amount of $6,704.70 in stocks, options, or other investments as of the filing date.[6] Excluding the checking account, the Debtor held the total amount of $144,816.96 in his savings and brokerage accounts on the filing date.[7] When the Debtor filed his petition, the financial institution froze the funds in the Debtor's savings account. The funds were released to the Debtor after intervention by the Trustee's office.

When the Debtor filed his schedules and statement of financial affairs, he listed his savings account as having the sum of $22,000, and his brokerage account as having the sum of $125,000, on Schedule B, which he labeled as "Exempt proceeds from the sale of homestead."[8] On Debtor's Schedule C, where he claimed his exemptions, he stated that the sum of $22,000 and the sum of $125,000 were exempt pursuant to A.R.S. §33-1101(A).[9]

The parties agree that February 28, 2007 is the date which is 18 months after the sale of the Debtor's residence. On that date, the Debtor held the sum of $165.91 in his brokerage account. The Debtor never reinvested any of the funds from the sale of his residence in a new homestead. The Debtor used the sum of $37,000 from his brokerage account, between March and September 2006, for living expenses and to purchase the estate's interest in his vehicle[10]. On October 24, 2006, the Debtor transferred the sum of $4,000 of his earnings from his checking account to his brokerage account. The Trustee never filed an objection to the Debtor's claim of exemption in the homestead proceeds.

---

**6.** Exhibit 23, Stipulated Facts xii, xiii, and xiv.

**7.** Id., Stipulated Fact xv.

**8.** Id., Stipulated Fact xvi.

**9.** Id. at Stipulated Fact xvii.

**10.** The parties agree that the Debtor utilized Check No. 1251, in the amount of $9,000, which cleared March 15, 2006, to purchase the estate's interest in his vehicle.

3

## III. ADDITIONAL FINDINGS OF FACT

The parties presented additional evidence to the Court at the trial in this matter. The Court makes the following additional findings of fact as a result of the evidence presented.

The Trustee is experienced, having served on the Chapter 7 panel of trustees in Arizona for 13 years and having handled a number of cases over the years. Because the Debtor filed just before the vast majority of the amendments to the Bankruptcy Code became effective,[11] the Trustee was handling at least a thousand files or more in early October 2005. He reviewed the Debtor's Schedules at the 341 meeting of creditors and noticed that the Debtor had claimed an exemption in the net proceeds received from the sale of his residence.[12] However, he recalled making the decision to allow the Debtor's claim of exemption in said proceeds.

The Trustee acknowledged that he had assisted the Debtor in having certain funds released post-petition from the financial institution that had placed a "freeze" on the Debtor's savings account. He conceded that he had never filed an objection to the claim of exemption in the sale proceeds or to the amount claimed. He testified that he was familiar with the claims in the Debtor's proceedings, with the Debtor owing approximately $95,000 in credit card debt and having a deficiency balance on his vehicle of $7,000. The Trustee noted that he was able to avoid the lien on the vehicle, which allowed the Trustee to sell the estate's interest in the vehicle, ultimately to the Debtor. The Trustee stated that he sold the vehicle back to the Debtor for the sum of $9,000 and that he was not sure of the source of payment from the Debtor. If the Debtor had not presented a good faith bid for the vehicle, the Trustee would have sold the vehicle at an auction.

---

**11.** The Debtor filed his petition on October 5, 2007, with the amendments to the law as a result of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 generally becoming effective 180 days after the date of enactment to those cases filed on October 17, 2005, or thereafter.

**12.** The Schedules that were reviewed by the Trustee were admitted into evidence as Exhibits 24 and 25.

4

The Trustee also testified that he did not realize that the Debtor had placed any of the funds in an investment account, believing that the Debtor would purchase a new homestead. The Trustee also stated that because of the Debtor's claim of exemption, the Trustee believed that he needed to wait 18 months to determine whether the Debtor had reinvested the funds in a new homestead. The Trustee did not stipulate, nor file a pleading with respect, to an abandonment of the estate's interest in the net sale proceeds.

The parties presented evidence as to the pre-and post-petition transactions concerning the brokerage account.[13] The Court has definite concerns as to this account. When the Debtor initially placed the sum of $125,000 in the brokerage account on September 1, 2005, he immediately commenced trading with the funds. For instance, he immediately purchased 100 shares of Altria Group, Inc. on September 8, 2005, with a settlement date of September 13, 2005, in the amount of $7,229.95,[14] and sold the shares of said stock on September 23, 2005, with a settlement date of September 28, 2005, for $7,177.74.[15] The Debtor also immediately utilized the account to engage in the purchase and sale of certain investments known as "puts" and "calls."[16] Without detailed information, the Court is unable to match all of the purchases and sales of such options. However, in some cases, the Debtor purchased an option in a stock and

---

**13.** *See* Exhibit 2.

**14.** Id. at 2.

**15.** Id. at 3. The Debtor also shows the loss from this transaction on his 2005 tax return. Exhibit 6 at 9, line 3 under "Short Term Capital Gains and Losses. . ." Indeed, the Debtor's tax return for 2005 reflects that he acquired stock worth $66,654.64 in that year, which he sold for $64,157, for a short-term capital gain of $2,498. Exhibit 6 at 8 and 9. Moreover, the Debtor did not list all of his transactions in options during this same time period. Compare Exhibit 2 with Exhibit 6.

**16.** Exhibit 2 reflects the purchase and sale of "puts" and "calls." For purposes of this decision, the Court has given the terms their ordinary meaning. The investment term "put" is an "option to sell a given quantity of a stock, commodity, etc., at a specified price and within a specified period of time." The term "call" is an "option to buy a given quantity of a stock, commodity, etc., at a specified price and within a specified time: calls are purchased in expectation of a rise in price." Webster's New World College Dictionary (4th ed. 2005).

was able to resell that same option within a relatively short period of time.  For instance, the Debtor purchased a "put" or "option" on September 14, 2005, with a settlement date of September 15, 2005, in the aggregate amount of $2,719.45, whereby the Debtor agreed to sell shares in the Hershey Company at $60 per share, with an expiration date, if not exercised, of November 19, 2005.[17]  However, on September 21, 2005, with a settlement date of September 22, 2005, the Debtor sold a put in the Hershey Company stock for $4,080.37,[18] which would be a profit for the transaction of $1,360.92 ($4,080.37 minus $2,719.45 =$1,360.92).  Although there is extensive activity reflected in this brokerage account, the parties have stipulated that, as of the filing date on October 7, 2005, the Debtor held $116,078.26, in identifiable cash proceeds from the sale of the residence,  and the sum of $6,704.70, invested in stocks, options, or other investments, in the brokerage account.

   At the trial in this matter, the Debtor confirmed that he utilized the brokerage account for a variety of investments, placing 25 percent of his orders by phone, and the remaining 75 percent over the internet.  Post-petition, the Debtor continued to trade in the brokerage account, purchasing and selling stocks and options.  The Debtor testified that although he intended to hold some investments for up to a year, he ultimately moved funds from his checking account to his brokerage account and back again, sometimes engaging in twelve to three hundred and two transactions a month.  When asked if he had become a "day trader,"[19] the Debtor took exception to the term, but conceded that at times, he traded on a daily basis from his

---

**17.** Id. at 2.

**18.** Id. at 3.

**19.** Webster's New World College Dictionary (4th ed. 2005) defines the term "day trading" as the rapid buying and selling of stocks on the Internet in seeking to profit from momentary price fluctuations,  with all positions typically closed out by the end of each day's trading."

brokerage account.[20]  He also stated that he checked on his investments "several times a day."

Perhaps to focus on the Debtor's trading practices, the Trustee presented evidence that as of

June 1, 2006, the Debtor had approximately $90,000 in his money market and investment

accounts at the brokerage firm, with $38,320 having been placed in investments.[21]  In July 2006,

those funds were had been reduced to a little over $52,000.[22]  By August 2006, the funds had

been further reduced in those accounts to roughly $32,000.[23]  By September 2006, the Debtor

only had $2,400 in the accounts.[24]  During the Trustee's examination, the Debtor conceded that

during the month of September 2006, he had had a loss from his investment activities in the

amount of $30,000.[25]  After the filing of his petition, during the time period from March through

September 2006, the Debtor also withdrew the sum of $37,000 from the brokerage account to

pay his living expenses and to purchase the estate's interest in his car.[26]

　　　　　The Debtor testified that the vast majority of his debt, as consumer debt, was

---

**20.**  The Debtor took further exception to the characterization of his trading activities as "day trading" in his Post-Trial Memorandum.  *See* Docket Entry No. 50.  The Debtor attached two Exhibits to the Memorandum in an attempt to show that his losses were due to general market losses rather than his own trading activity.  These Exhibits were not presented at the trial in this matter.  Hence, the Debtor did not authenticate, lay a foundation for, or make a showing that the Exhibits should be admitted over any objections, such as hearsay, that might be interposed by the Trustee.  General principles of fairness and due process dictate that this Court not consider said Exhibits as a part of this Decision.

**21.**  Exhibit 3.

**22.**  Id.

**23.**  Id.

**24.**  Id.

**25.**  Id.  At the beginning of September 2006, the Debtor held $22,900 in his money market account and the sum of $9,329 in various investments, for a total of $32,229 in his brokerage accounts.  By the end of the month, he held only $43.33 in his money market account, and $2,390.00 in investments as to the same accounts.

**26.**  *See* Exhibit 23, Stipulated Fact xxii; *also see*  Exhibit 3.

7

owed to various credit card companies at the time he filed his petition. He stated that he had been in a relationship for the last six years with someone, and that after he had sold his residence, he and his girlfriend had moved into a new residence in Peoria a few weeks before he filed his bankruptcy petition. His girlfriend, however, was the only one to execute the residential lease. In April 2007, the Debtor and his girlfriend moved to another residence, having determined not to renew the residential lease, and the Debtor still resided at said residence as of the time of the trial in this matter.

The Debtor testified that he was a mortgage consultant and had engaged in that or a similar business for the last nine years. He essentially obtained loans, for a number of borrowers, from various lenders. He had been a mortgage consultant in Arizona for the last three and a half years. He had worked for a number of companies over the years, either as an employee or an independent contractor. Since August 2005, however, his work as a mortgage consultant had been as an independent contractor. The Debtor was unsure what his income had been in 2006 and stated that as of the trial in this matter, he had not filed his 2006 state and federal tax returns. The Debtor did present evidence as to his income in 2005.[27] The Debtor testified that his income as a mortgage consultant in 2005 was around $10,000. He also stated that he made disbursements from his Individual Retirement ("IRA") and his 401(K) Retirement ("401(K)") Accounts during 2005. He had the amount of $18,782 in his IRA, and the amount of $6,362 in his 401(K) at the time that he filed his bankruptcy petition. As of the time of the trial, he had no funds in the IRA or the 401(K) Accounts.

The Debtor testified that no funds were left from the savings or brokerage accounts that originally contained the net proceeds from the sale of his residence. He believed that the funds from those accounts were used to purchase investments and for living expenses. However, upon further cross examination, the Debtor conceded that as of February or March of 2007, the Debtor had placed $7,000 into an Options Express account, made investments, and

---

**27.** *See* Exhibit 6.

8

that the then balance was only $900. The Debtor also conceded that in the spring of 2006, he had transferred $5,000 from his brokerage account, to his checking account, ultimately transferring the funds to his stepmother, to cover "his share" of the wedding and travel costs for his adult sister. The Debtor was vague and ambiguous as to how or why he was responsible for any of the costs of his sister's wedding. Upon being pressed on the issue, the Debtor stated that he thought he should pay a similar amount as other family members. The Debtor further testified that of the $22,034 in net sale proceeds that he had held in his savings account and which the Trustee had assisted him in releasing from a "freeze," the Debtor had utilized the sum of $9,000 to purchase the estate's interest in his vehicle.[28] The Debtor stated that the balance of the funds in the savings account, or roughly the sum of $13,000, had been utilized by the Debtor to move from the Donald Drive residence to the rented home, even though the Debtor sold his residence in August 2005, filed bankruptcy in October 2005, and did not allegedly move into his new residence until after he filed his bankruptcy petition. He did not recall if he used any of the funds to make rental payments on his new residence or to obtain food or provisions.

The Debtor testified that once he filed a bankruptcy petition, he had problems with his credit, making it difficult for him to enter into a lease agreement or to obtain a mortgage for a residence. The Debtor testified at trial that after he had sold his residence, he had talked with several real estate agents and mortgage brokers about his circumstances and the ability to obtain financing to purchase a new home. He noted that he had filled out mortgage pre-qualification forms and that he had spoken with four or five subprime lenders which he named on the record. However, the Court concludes that the Debtor created this testimony out of whole

---

**28.** Since the parties stipulated that the Debtor had withdrawn the sum of $37,000 from his brokerage account to, inter alia, purchase the estate's interest in the vehicle (*See* Exhibit 23, Stipulated Fact xxii), it is unclear to the Court why the Debtor testified that he transferred the funds to his savings account before purchasing the vehicle. However, the Debtor's testimony on this point is not critical to the issues to be considered by the Court.

9

cloth. He was not credible and was seriously misleading. His deposition transcript[29] reflected that he simply looked online as to real estate agents, that he didn't recall if he ever discussed with an agent his purchase of a residence, that he only rode through the neighborhoods and viewed a few open houses, that he may have looked at advertisements in the newspaper concerning the purchase of a residence, and that he called a few bank representatives, but never met with them, about obtaining financing, and that he met with one subprime lender who subsequently went out of business, but did not recall any names of any subprime lenders that he contacted. The Court concludes that the Debtor chose to continue with his trading activities through his brokerage accounts and that there was no credible evidence to support the Debtor's theory that because of the filing of his Chapter 7 petition, he was unable to obtain a mortgage or loan to reinvest his homestead proceeds in a new residence within the requisite 18-month period.

## IV. ISSUES PRESENTED

Although the parties have described the issues somewhat differently, the Court has set forth below the various issues to be addressed. In some cases, the Court has outlined one or more issues presented by the parties as sub-issues to be resolved.

A. Whether The Trustee's Failure To Object To The Debtor's Exemption Is Dispositive Of The Issues In This Matter.

B. Whether Arizona Law Requires That A Debtor Reinvest Homestead Proceeds Solely In A New Homestead To Retain The Exemption.

C. Whether The Debtor Is Required To Turn Over The Amount Of The Net Homestead Proceeds At The Time Of Filing If The Debtor Does Not Reinvest The Proceeds In A New Homestead Within The Time Required Under Arizona Law.

---

**29.** *See* Deposition of the Debtor, dated May 30, 2007, at 30.

10

## V. LEGAL DISCUSSION

A.  Whether The Trustee's Failure To Object To The Debtor's Exemption Is Dispositive Of The Issues In This Matter

The Debtor argues that the Trustee's failure to object to the Debtor's claim of exemption in the net homestead proceeds is dispositive of all issues in ths matter.  As noted previously, the Debtor listed his savings and brokerage accounts in his Schedule B delineating the personal or intangible property in which the Debtor had an interest as of the filing of the petition. The Debtor stated that the sum of $22,000 in his savings account and the sum of $125,000 in his brokerage account were "[e]xempt proceeds from the sale of the homestead."[30] On schedule C, where the Debtor claimed his exemptions, he stated the sum of $22,000 and $125,000 were exempt pursuant to A.R.S. § 33-1101(A).[31]  Because Section 33-1101(A) only refers to a claim of exemption in real property, the Debtor argues that such a patently incorrect answer required an objection by the Trustee.

The filing of a bankruptcy petition creates an estate that consists of all of the debtor's legal and equitable interests in property, including potentially exempt property. 11 U.S.C. § 541; Cusano v. Klein, 264 F.3d 936 (9th Cir. 2001); In re Trujillo, 215 B.R. 200 (9th Cir. B.A.P. 1997); In re Smith, 352 B.R. 801 (9th Cir. B.A.P. 2006); In re Chappel, 189 B.R. 489 (9th Cir. B.A.P. 1995). There is no dispute between the parties that when the Debtor filed his bankruptcy petition the funds in his savings and brokerage accounts became property of the Debtor's estate. Section 522(b) of the Bankruptcy Code allows a debtor to exempt property from the bankruptcy estate. In re Lekas, 299 B.R. 597 (Bankr. D. Ariz. 2003). Arizona has "opted out" of the federal Bankruptcy Code's exemptions; therefore, Arizona law governs homestead exemptions. 11 U.S.C. § 522 (b); A.R.S. § 33-1133(B) (West 2007); In re Smith, 342 B.R. 801

---

**30.** *See* Exhibit 23, Stipulated Fact xvi.

**31.** Id. at Stipulated Fact xvii.

11

(9th Cir. BAP 2006).

A.R.S. § 33-1101(A) provides, in pertinent part, as follows:

> Any person the age of eighteen or over, married or single, who
> resides within the state may hold as a homestead exempt from
> attachment, execution and forced sale, not exceeding one hundred
> fifty thousand dollars in value, any one of the following:
>
>> 1. The person's interest in real property in one compact body upon
>> which exists a dwelling house in which the person resides.
>> 2. The person's interest in one condominium or cooperative
>> in which the person resides.
>> 3. A mobile home in which the person resides.
>> 4. A mobile home in which the person resides plus the land
>> upon which that mobile home is located.

The Debtor is correct that this subsection refers to a claim of exemption in real property.

However, the Debtor created an ambiguity by asserting an exemption in the proceeds of real

property, which he had placed in the savings and brokerage accounts. This ambiguity was

amplified by his claim on Schedule B, which listed his personal and intangible property, that he

claimed an exemption in the proceeds received from the sale of his residence. It is actually

A.R.S.§ 33-1101 (C) which focuses on a claim of exemption in the homestead proceeds. That

subsection provides:

> The homestead exemption, not exceeding the value provided for in subsection A,
> automatically attaches to the person's interest in identifiable cash proceeds from
> the voluntary or involuntary sale of the property. The homestead exemption in
> identifiable cash proceeds continues for eighteen months after the date of the sale
> of the property or until the person establishes a new homestead with the proceeds,
> whichever period is shorter. Only one homestead exemption at a time may be held
> by a person under this section.

A.R.S.§ 33-1101 (C). Any party reviewing the Debtor's Schedules would note a consistent

claim of an exemption in the homestead proceeds, not the real property. Nor would a party focus

on Subsection "A" versus subsection "C," so long as the correct statutory provision, A.R.S.§ 33-

1101 was set forth. By placing the wrong subsection on Schedule C, the Debtor created an

ambiguity.

Although <u>Taylor v. Freeland & Kronz,</u> 503 U.S. 638, 112 S.Ct. 1644, 1647, 118

12

L.Ed.2d 280 (1992), initially seemed to require that any error or omission with respect to a claim of exemption by a debtor required affirmative action in the nature of a timely objection by the trustee, the Ninth Circuit has subsequently carved an exception to the rule. The cases have determined that if a claimed exemption is ambiguous, it will be resolved against the debtor. In re Kahan, 28 F.3d 79 (9th Cir.1994), cert. denied, 513 U.S. 1150, 115 S.Ct. 1100, 130 L.Ed.2d 1067 (1995); In re Hyman, 967 F.2d 1316 (9th Cir. 1992). In the decision of Hyman, the debtors initially correctly listed their statutory exemption in their home of $45,000. When the trustee then retained a broker and attempted to sell the property, the debtors stated that they wished to claim their entire interest in the property as exempt, and the trustee was barred from taking any action because he had failed to file an objection. Ultimately, the Ninth Circuit concluded that the debtors had made an ambiguous exemption claim, and that the trustee had no reason to object when the debtors later attempted to expand the amount of the claimed exemption. Hyman at 1319 and n.6.

In this case, the Debtor listed Section 33-1101 for his claim of exemption, which is the correct statutory section, and repeatedly referred to an "exemption in proceeds." Based on this information, the Trustee had no reason to object.[32] On this record, the Court concludes that given the ambiguity of the Debtor's claim of exemption, the Trustee acted appropriately and did not need to file an objection to the Debtor's claim of exemption.[33]

The Debtor's second argument on this issue asserts that the Trustee was required

---

**32.** If the situation were reversed and the Trustee had objected to the claim of exemption, the Debtor would have accused the Trustee of bad faith and sought sanctions against him.

**33.** The Court has predicated its ruling on the ambiguity created by the Debtor's claim of exemption. However, the Trustee also cogently argues that Fed.Rs.Bankr.P. 4003 and 1007 and Official Form 6 only require the Debtor to "list" property claimed as exempt; that it is only this list to which the Trustee should object; and in this case, the list correctly included a claim in the exempt proceeds. Thus, the Trustee was not required to object to the Debtor's claim of exemption. The Court agrees that this argument is an alternative basis on which this Court may conclude that the Trustee was not required to file an objection.

13

to file an objection to the Debtor's claim of exemption under A.R.S. § 33-1101(C). However,

the case law from this Circuit, interpreting this very provision of Arizona law, is clear, that if

there is a statutory condition subsequent, or a period of time under applicable law that a debtor

has to reinvest homestead proceeds, the trustee may wait until the applicable time period has

passed to act to recover the proceeds. There is no requirement that the Trustee file an objection.

In re Golden, 789 F.2d 698 (9th Cir. 1986); In re Smith, 342 B.R. 801 (9th Cir. BAP 2006); In re

Konnoff, 341 B.R. 28 (Bankr. D. Ariz. 2006).

B. Whether Arizona Law Requires That A Debtor Reinvest Homestead Proceeds
Solely In A New Homestead To Retain The Exemption.

      The Trustee argues that either under a use or intent theory, Arizona law requires

that a debtor may only reinvest the net proceeds in a new homestead.[34] The Arizona homestead

statute is set forth at A.R.S. § 33-1101. Because the homestead was created by statute, the Courts

must review the statute to determine its meaning. In re Plant, 300 B.R. 22 (Bankr. D. Ariz.

2003). If the statute is plain in its meaning, it must be followed. Id. at 23. However, if there is

any ambiguity or lack of clarity, the homestead statutes should be interpreted liberally to

advance the objectives of the statute. Id.

      Although Arizona has had a homestead statute for many years, the legislature did

not include homestead proceeds specifically within the prior versions of the law.[35] There is no

legislative intent setting forth why Subsection (C) was added to A.R.S. 33-1101 in 1971.

However, in reviewing the case law over the years as to the Arizona homestead exemption, the

Courts have concluded that the legislative purpose of the homestead exemption statutes was to

**34.** *See* Trustee's Trial Memorandum, Docket Entry No. 48, at pp. 3-6 and 10-15.

**35.** Compare A.R.S § 33-1101(C) with the prior versions of Arizona law as set forth in McFarland v. Pruitt, 69 Ariz. 133, 210 P.2d 963 (1949); Union Oil Co. of Arizona v. Norton Morgan Commercial Co., 23 Ariz. 236, 202 P. 1077 (1922); Security Trust & Savings Bank v. McClure, 29 Ariz. 325, 241 P. 515 (1925).

allow the family to keep a certain amount of money to provide a shelter for the family.
McFarland v. Pruitt, 69 Ariz. 133, 210 P.2d 963 (1949); Union Oil Co. of Arizona v. Norton
Morgan Commercial Co., 23 Ariz. 236, 202 P. 1077 (1922); Security Trust & Savings Bank v.
McClure, 29 Ariz. 325, 241 P. 515 (1925).

The fundamental purpose of the Arizona homestead law is to protect the family
against the forced sale of its home. In re Irwin, 293 B.R. 28 (Bankr. D. Ariz. 2003); Matcha v.
Winn, 131 Ariz. 115, 638 P.2d 1361 (Ariz.App. 1981); Schreiber v. Hill, 54 Ariz. 345, 95 P.2d
566 (1939). The homestead exemption laws were not created merely for the purpose of
conferring a favor or privilege on a debtor, but to shelter the family and thereby maintain the
stability and welfare of the state. Ferguson v. Roberts, 64 Ariz. 357, 170 P.2d 855 (1946).

However, there are currently no cases under Arizona law which directly support
the Trustee's theory that the net proceeds received from the sale of a homestead may only be
reinvested in a new homestead.  The Arizona Supreme Court has held that if there are no cases
directly on point regarding a homestead statute, the Court may look to the reasoning of other
state courts which have similar homestead statutes. Wuicich v. Solomon-Wickersham Co., 18
Ariz 164, 157 P. 972 (1916). The Bankruptcy Appellate Panel has already concluded that the
California homestead statute is similar to the one in Arizona. In re Smith, 342 B.R. 801 (9th Cir.
BAP 2006). Certainly the case law in California is supportive of the Trustee's position. For
instance, in one decision, the California Court states, "although, in granting an exemption to the
proceeds of a voluntary sale of the homestead for a period of six months...the legislature has
imposed no requirement of reinvestment, obviously the true purpose of giving the owner that
time is to permit him to move his family to another home with the retention of protection from a
forced sale." Thorsby v. Babcock, 36 Cal.2d 202, 222 P.2d 863, 866 (1950).  In another, the
Court comments that the "benign object" of the statute is to protect the homeowner "from a
forced sale, and not to withdraw from the reach of creditors property of the debtor as a source of
revenue for the support of himself or family." Maloney v. Hefer, 75 Cal. 422, 424-425, 17 P.

539, 540 (1888). By allowing a debtor to trace exempt proceeds or money,[36] the general intent of California's exemption allows the owner of the homestead to retain an interest in the proceeds, in the event of a voluntary sale or accidental loss, to substitute one family home for another without losing the benefit of the exemption. Haatland v. Corporate Management, Inc., 172 B. R. 174 (S.D. Cal 1989). The Arizona cases seem to support this general proposition. For instance, one decision states that the purpose of setting aside a homestead exemption is to ensure a home for the family. In re Stranger's Estate, 75 Ariz. 399, 257 P.2d 593 (1953). Other cases have concluded that the homestead laws were not created merely for the purpose "of depositing a favor or privilege on a debtor, but to shelter the family and thereby benefit the estate." Ferguson v. Roberts, 64 Ariz. 357, 170 P.2d 855 (1946); cf. Union Oil Co. of Arizona v. Norton Morgan Commercial Co., 23 Ariz. 236, 202 P. 1077 (1922); Security Trust & Savings Bank v. McClure, 29 Ariz. 325, 241 P. 515 (1925). Moreover, certain transfers of the homestead property are an abandonment of the homestead under Arizona law.[37] In re Strasser, 303 B.R. 841, 848 (Bankr. D. Ariz. 2004); In re Trujillo, 215 B.R. 200, 205 (9th Cir. BAP 1997).

Although the Bankruptcy Appellate Panel specifically concluded that the California homestead statute is similar to Arizona's, the Arizona Supreme Court has held that the Court may look to the reasoning of any state court that has a homestead statute similar to Arizona's. See In re Smith, 342 B.R. 801 (9th Cir. B.A.P. 2006); Wuicich v. Solomon-Wickersham Co., 18 Ariz 164, 157 P. 972 (1916). Idaho, Illinois, and Texas have homestead statutes that are similar to Arizona's,[38] and these States have interpreted their statutes to allow a

---

**36.** See Cal. Civ. Proc. Code § 704.960.

**37.** Although counsel for the Debtor, at the conclusion of the evidentiary hearing in this matter argued that In re Foreacre, 358 B.R. 384 (Bankr. D.Ariz. 2006) was incorrectly decided, the Court stated that the decision relied on numerous theories in its analysis. Of course, the debtors' post-petition transfer of the homestead proceeds to a family member, through a fraudulent process, might be deemed an abandonment under a Strasser analysis.

**38.** Each of these statutes provides for an exemption in proceeds from the sale of a homestead, which exemption expires after a certain number of months pass. IDAHO CODE ANN.

Case 2:05-bk-21488-SSC    Doc 52    Filed 09/28/07    Entered 09/28/07 15:17:04    Desc
Main Document    Page 16 of 23

debtor an exemption in homestead proceeds only if the proceeds are reinvested in a new home.[39]

In Texas, for example, any amount claimed as homestead proceeds but used instead to purchase items other than a new homestead, loses its exempt status and must be turned over to creditors. In re Jones, 327 B.R. 297, 327 (Bankr. S.D.Tex. 2005). The Court in In re Jones, quoting the Fifth Circuit's decision of In re Zibman, 268 F.3d 298 (5th Cir. 2001), reasoned that the intent of the homestead proceeds exemption is to protect a debtor against homelessness, rather than to protect the homestead proceeds themselves. The courts in Illinois have interpreted the Illinois homestead exemption in a similar manner. In one decision, the Court held that an expenditure of the proceeds for general purposes is not contemplated by the homestead exemption statute, and any proceeds used for such general purposes lose their exempt status.[40] In re Ziegler, 239 B.R. 375, 378-80 (Bankr. C.D. Ill. 1999). Idaho's courts have also interpreted that State's homestead proceeds exemption to require the debtors to reinvest the proceeds in a homestead or lose the exemption; debtors that use the proceeds in other ways are required to turn over any amount expended on anything other than a homestead to their creditors.

§ 55-1113 (2007) (Idaho homestead proceeds are exempt for a period of six months after sale of the homestead); 735 ILL. COMP. STAT. 5/12-906 (West 2007) (Illinois homestead proceeds are exempt for a period of one year after sale of the homestead); TEX. REV. PROP. CODE ANN. § 41.001(c) (Vernon 2007) (Texas homestead proceeds are exempt for a period of six months after sale of the homestead).

**39.** Florida's Constitution provides for a homestead exemption in a residence only, and thus is dissimilar to Arizona's statute, which allows an exemption in proceeds as well as a physical residence. FLA. CONST. art. 10 § 4. However, Florida's highest court has interpreted the homestead exemption to extend to proceeds from the sale of a homesteaded residence "where there is a bona fide intention on the part of the owner of the homestead to reinvest them in another homestead." Orange Brevard Plumbing and Heating Co. v. LaCroix, 137 So.2d 201, 204 (1962). Through judicial interpretation, then, the homestead exemption becomes similar to Arizona's homestead proceeds exemption, although Florida's courts require a showing of intent that is not found in Arizona's (or California's) statute and case precedent.

**40.** Similar to the Florida Courts, however, some opinions from Illinois create an "intent" requirement that Arizona and California have not imposed. See e.g. In re Sizemore, 2001 WL 34079528 (Bankr. C.D.Ill. 2001).

17

In re Deglopper, 53 B.R. 95, 97 (D. Idaho 1985).[41]

Although the Court does not support the Trustee's theory that the homestead proceeds must be used only for reinvestment in a new homestead,[42] the facts of this case clearly support the Trustee's requested relief. The Debtor immediately placed the vast majority of his funds into a brokerage account from which he purchased, sold, or obtained a number of investments that were contrary to an intent to reinvest in a new homestead or any exempt property. Thus, the Debtor's claim of exemption in the net sale proceeds was appropriate at the time he filed his petition, so the Trustee could not, in good faith, object to his claim of exemption. However, the Debtor's subsequent and numerous trading activities in his investments were so contrary to the Debtor's claim of exemption in the homestead proceeds that the Debtor abandoned his claim of exemption to those proceeds. Moreover, the Debtor engaged in risky investments as evidenced by the Debtor's loss of funds over a relatively short period of time.[43] Indeed, the Debtor conceded, at the time of trial, that he had over a $30,000 loss from his investment activities in one month. Since the Trustee maintained a "contingent, reversionary interest"[44] in the homestead proceeds, and never abandoned that interest in these bankruptcy proceedings, the Trustee was permitted, at the end of the 18 months, to inquire as to the Debtor's use of the proceeds and whether they had been appropriately reinvested. Because the Debtor dissipated a potential estate asset, the Debtor became liable for the turnover of those proceeds. In re Golden, 789 F.2d 698 (9th Cir. 1986). From this analysis, the Trustee argues, and the Court

**41.** A more recent Idaho case has followed Florida and Illinois in creating an "intent" requirement. *See* In re Kierig, 2000 WL 33716996 (Bankr. D.Idaho 2000).

**42.** For instance, the Court could envision the Debtor transferring the funds to another exempt asset under state or federal law, such as an appropriate retirement plan.

**43.** *See* Exhibit 3. In June 2006, the Debtor had roughly $90,000 in his checking and brokerage accounts; by July 2006, he retained approximately $52,000; by August 2006, he had about $32,000 in the accounts; and by September 2006, he only had $2,400 in the accounts. The Trustee estimates that over $100,000 was spent by the Debtor in such trading activities.

**44.** *See* In re Smith, 342 B.R. 801, 808 (9th Cir. BAP 2006).

18

1    agrees, that the Debtor's lack of intent to reinvest the proceeds, as exhibited by his conduct,

2    requires the turnover of the full amount of the homestead proceeds to the Trustee.

3

4    C.  Whether The Debtor Is Required To Turn Over The Amount Of The Net Homestead
      Proceeds At The Time Of Filing If The Debtor Does Not Reinvest The Proceeds In A New
5    Homestead Within The Time Required Under Arizona Law.

6

7             The Trustee finally argues that given the Debtor's failure to reinvest the

8    homestead proceeds in a new residence, the Trustee and the bankruptcy estate are entitled to

9    recover the full amount of the exemption claimed by the Debtor as of the filing date of the

10    petition.  Certainly Ninth Circuit precedent supports the Trustee's argument. In the decision of

11    In re Foreacre, 358 B.R. 384 (Bankr. D. Ariz. 2006), this Court commented, analyzing the In re

12    Golden  decision at 789 F.2d 698 (9th Cir. 1986),

13          [T]he  debtor sold his residence and filed his Chapter 7  bankruptcy petition less
            than two months later.  The debtor still retained the sum of $25,000 from the sale
14        of his residence at the time of the petition filing.  Id. at 699.  Under California
            law, the debtor had a period of six months from the sale of his homestead
15        property to "select" another homestead with the proceeds.  Id.  Although the
            debtor asserted a claim of exemption in the remaining proceeds on his bankruptcy
16        schedules, the Chapter 7 trustee chose not to oppose the claim of exemption.
            Unfortunately, although the debtor had full use of the proceeds, he did not timely
17        reinvest the proceeds in a residence within the six months provided under
            California law.   Once the six-month period under California law had expired, the
18        trustee filed a pleading, requesting a turnover of the proceeds.  Id.  The Ninth
            Circuit noted that when the debtor elected to claim an exemption under applicable
19        state law, the debtor was bound by the state law in effect on the date that the
            bankruptcy petition was filed. Id. at 700.  Relying on the applicable California
20        statute, and the case law interpreting it, the Court determined that to permit a
            debtor to retain the proceeds, with no time limitation, would be a detriment to the
21        debtor's creditors without any benefit to the debtor's family.  Yet, the California
            homestead statute was designed to protect the debtor's family.  The Ninth Circuit
22        stated, "California law requires reinvestment in order to prevent the debtor from
            squandering the proceeds for non-exempt purposes. . . Applying California law,
23        we therefore hold that when the debtor fails to reinvest homestead proceeds
            within a period of six months in which the debtor has control of those proceeds,
24        the proceeds revert to the trustee."  Id.

25    358 B.R. at 390-91. The debtor, in Golden, requested that since he had expended a portion of the

26    $25,000 after the bankruptcy petition was filed, he not have a judgment entered against him for

27

28                                       19

the full amount of the homestead exemption. The Ninth Circuit concluded that the purpose of the California exemption in homestead proceeds was to prohibit a squandering of funds by the debtor, and the lower Court did not err in requiring the debtor to turn over the full amount of the proceeds that the debtor had on hand the day he filed his petition. In re Golden, 789 F.2d 698, 701 (9th Cir. 1986),

In the decision of In re Smith, the Panel described a trustee as having a "contingent, reversionary interest" in the homestead proceeds under Arizona law. In re Smith, 342 B.R. 801, 808 (9th Cir. BAP 2006). Thus, when the debtor did not reinvest the proceeds in a homestead within the 18- month period, the Panel concluded that the debtor had lost his claim of exemption in the proceeds as a matter of law. Id. at 808. In this case, the Trustee never abandoned his interest in the homestead proceeds, so the estate had the same contingent, reversionary interest in the homestead proceeds as in the Smith decision.

Based upon this precedent, the Court concludes that the funds held by the Debtor constituting the net proceeds from the sale of his residence and held by the Debtor on the date that he filed his petition must be returned to his estate. On the filing date, the Debtor held the sum of $22,034.00 in identifiable cash proceeds in his savings account, the sum of $116,078.26 in the cash component of his brokerage account, and the sum of $6,704.70 in various investments in his brokerage account for the total amount of $144,817.46, which must now be turned over to the Trustee. The Debtor ultimately transferred funds between his checking account, brokerage account, and his savings account. On February 28, 2007, 18 months after the sale of his homestead and the date by which the Debtor should have reinvested the funds, the Debtor only had $165.91 in his brokerage account. As noted, the Debtor lost a substantial amount of money in his brokerage account over a three-month period in 2006. The Debtor also used the sum of $9,000 from the brokerage account to acquire the estate's interest in his vehicle, and he expended the sum of $5,000 on the wedding and travel costs of his adult sister.

Although the parties did stipulate that the Debtor utilized the sum of $28,000

"for living expenses" between March and September 2006,[45] the Debtor provided no evidence

that the funds were utilized for shelter or other critical expenses of his family or himself. For

instance, there was no evidence that the funds were utilized to pay medical expenses, rent, or

other critical expenditures.[46] The Court is unable to conclude on this record that the Debtor

utilized any of the net sale proceeds to "provide a shelter for his family," which is what may be

construed as necessary under Arizona law to claim an exemption in the homestead proceeds.[47]

Under the Ninth Circuit precedent, in particular the decision of <u>Golden</u>, 789 F.2d at 701, the

Court concludes that the Debtor must turn over the sum of $144,816.96 in identifiable cash

proceeds from the sale of his residence which the Debtor failed to reinvest in a new homestead.

The Court appreciates that there may be facts presented in future cases which may require a

different result, such as allowing a debtor to expend the homestead proceeds for critical

expenditures of the family. However, the facts of this case should not permit a deviation from

the ruling in <u>Golden</u>. In essence, the Court has determined that the Debtor squandered the net

cash homestead proceeds.[48] Unfortunately, this Court's Decision does require to analyze the

issues on a case-by-case basis.[49]

---

**45.** *See* Exhibit 23, Stipulated Fact xxii ($37,000 minus $9,000 = $28,000 for living expenses).

**46.** The Debtor testified at trial, for instance, that he had no recollection of any of the funds being utilized to pay the rent for the home in which he was residing. The Debtor also failed to testify that the funds were utilized to pay taxes, student loans, or other non-exempt obligations.

**47.** See the case cited in the text under Topic B of this Decision.

**48.** *See* In re Foreacre, 358 B.R. 384 (Bankr. D. Ariz. 2006) in which the Court determined that the fraudulent, post-petition transfer of homestead proceeds to a family member also did not warrant protection under Arizona law.

**49.** The Court is mindful that there is a footnote in In re Smith, 342 B.R. 801, 804, n.2 (9th Cir. BAP 2006), that assumes, without deciding, the "use" of the homestead proceeds, after the filing date, is permissible under Arizona law. In the decision of In re Konnoff, 356 B.R. 201 (9th Cir. BAP 2006), the concurring opinion, in a footnote, also believes that an Arizona debtor

Finally, the Trustee summarily requests, in his post-trial memorandum of law, that the Debtor now be required to turn over the vehicle as well, so that the Trustee may re-sell the vehicle at auction. Given this Court's ruling that the Debtor must now turn over the sum of $144,816.96 to the Trustee, which includes the sum of $9,000 paid to the Trustee for the estate's interest in the vehicle, the Court sees no basis on this record to add insult to injury and require the turnover of the vehicle as well.

## VI. CONCLUSION

The Court concludes that the Debtor is in error as to his claim that the Trustee should have filed an objection to his claim of exemption in the homestead proceeds. Since the Trustee never abandoned the interest in the proceeds, the estate continued to have a contingent, reversionary interest in the homestead proceeds for a period of 18 months after the sale of the homestead. In this case, the Debtor utilized the sum of $144,816.96 in a manner that was inconsistent with, and diametrically opposed to, his claim of exemption in the identifiable cash proceeds derived from the sale of his homestead. Under Ninth Circuit precedent, the Debtor is now required to turn over the sum of $144,816.96 to the Trustee for the benefit of the Debtor's creditors. The Debtor is not required at this time to turn over the vehicle to the Trustee. The Court will execute a separate order on this matter and the Trustee shall submit a judgment consistent with this Decision.

DATED this 28th day of September, 2007.

_____

may use the homestead proceeds "for any purpose" during the "18-month safe harbor period." Id. at 209, n. 8. This Court disagrees, but the statements were made in dictum or were unnecessary to the ultimate decision of the case, so they do not have precedential effect. Cetacean Community v. Bush, 386 F.3d 1169, 1173 (9th Cir. 2004).

22

_Sarah Sharer Curley_

Honorable Sarah Sharer Curley
United States Bankruptcy Judge

23